BARTLES VS COURTNEY.

Opinion rendered November 24, 1906.

(98 S. W. Rep. 133).

1.  *Partnership—Misrepresentation of One, Liability of Others.*

The members of a partnership are liable for the fraud of one of its members, if committed by him in transacting the business of the firm and for its benefit.  But a partnership is not answerable for the fraud of one of them with reference to the financial standing

of one of its customers because such matters were wholly outside the business transactions of said partnership.

2. *Complaint, Allegations of—When Sustained.*

A representation in response to a request as to the financial standing of R. that R's dealings had been satisfactory during the present season, will not sustain an allegation that R. was recommended as prompt and having satisfactorily performed his business agreements with defendants, as having settled all claims against him and as being a man worthy of credit.

3. *Misrepresentation—When Honestly Made Party Not Liable For Deceit.*

Although a representation may be false, if same was honestly made, the party so making such a representation is not liable for deceit.

4. *Agency—Misrepresentation.*

A firm is not liable for a misrepresentation made by its agent who has no interest in the firm, which misrepresentation had no connection with any business of the firm unless it knew of such representation and ratified same.

5. *Instruction—Fraud—What Constitues.*

An instruction that mere silence or a failure to communicate facts within the seller's knowledge is not such a fraud as will avoid a contract or render the seller liable. To have that effect there must be some concealment, as by with-holding information when asked, or by using some trick or device to mislead the purchaser, was inapplicable to this case and may have mislead the jury.

Appeal from the United States Court for the Northern District of the Indian Territory; before Justice Joseph A. Gill, January 31, 1902.

Action by J. L. Courtney against J. H. Bartles and others. From a judgment for plaintiff, defendants appeal. Reversed and remanded.

On the 9th day of September, 1897, the plaintiff (appellee) filed his complaint against the defendants (appellants) and alleged: That defendant Moore is a citizen of the United

States. That in the latter part of the year 1896 and the earlier part of 1897 defendants were jointly engaged in buying and shipping horses and mules. That during those transactions one G. W. Roy became largely indebted to them, and that defendants learned that he was insolvent. That with said Roy there was connected one Crabtree. That after defendants learned that Roy was insolvent and unable to pay them, "said Roy and defendants entered into an agreement, by which Roy was to buy from other parties on credit secured by the recommendation of the defendants sufficient property to pay off and discharge the debt owed to the defendants, and should apply the proceeds to the payment of the debt owed by said Roy to defendants." On December 4, 1896, in pursuance of said arrangement, Roy applied to plaintiff to purchase a car load of mules and horses, and gave to plaintiff the name of the defendants as references to determine his standing and financial responsibility. That plaintiff, before delivering to Roy the stock, went to one of the defendants, viz., A. H. Gibson, to ascertain the "financial responsibility and standing of the said Roy." That Gibson, pursuant to said arrangement, recommended Roy as being prompt, "and as having satisfactorily performed his business agreements with defendants, and as having settled all claims of defendants against him, and as being a man worthy of credit." That then plaintiff delivered to Roy the stock, and they agreed Roy should pay plaintiff for them $1,215 on February 23, 1897. That plaintiff relied upon the recommendations of said 'Gibson. That in fact the transactions between Roy and defendants had not been satisfactory. That Roy had not promptly met his obligations to defendants. That he was largely indebted to them at the time; all of which Gibson knew. He also knew he was not worthy of credit; that Roy was insolvent at the time, and Gibson knew it; that Roy took the stock away as soon as delivered and the proceeds were applied to the payment of the

indebtedness of Roy to the defendants, "pursuant to said agreement;" that Roy shortly absconded and plaintiff never was paid for his stock; that their value was $1,215, and by reason of the conduct of the defendants and the recommendations of the defendants, plaintiff has been damaged in the sum of $1,215, for which he asks judgment against defendants and for costs and all other relief.

On October 21, 1897, defendant W. L. Moore filed his his separate answer, admits he is a citizen of the United States, and denies he was ever jointly engaged in buying and shipping horses and mules with the above-named defendants, or that he had any interest in said transactions with the above-named defendants; says he was an employe of his codefendants at a stipulated salary, and had no interest in their business or the profits thereof save as such. On October 29, 1897, defendants Bartles, Barndollar, and Gibson filed their answer, and say that they are citizens of the Cherokee Nation, and that plaintiff is a citizen of the Cherokee Nation, and that the court, by reason of said citizenship, has no jurisdiction of the cause. They admit that in 1896 they had been buying and shipping horses and mules. They admit they sold horses to G. W. Roy, Crane and Roy, Howell and Roy, and a man named Crabtree who was working with him. They deny that at any time or place they or either of them entered into an agreement by which the said Roy was to buy from other parties stock on credit secured by the recommendation of the defendants herein, and to pay and discharge the debts owed to the defendants by the said Roy. They further deny that on December 4, 1896, the said Roy, pursuant to any agreement made with them, applied to the plaintiff herein to purchase of him a car load of stock consisting of mules and horses. As to allegation that Roy gave the name of defendants to determine his standing and financial responsibility, defendants

have not sufficient information to answer, but demand strict proof. The defendants further deny that plaintiff herein, before selling or delivering the stock to the said Roy, as alleged in his complaint, went to them or either of them to ascertain the financial responsibility and standing of the said Roy, and deny that the defendant herein, namely, A. H. Gibson, in pursuance of any agreement made with the said Roy, or in any other way, recommended the said Roy as being prompt and having satisfactorily performed his business agreement with defendants, and as having settled all claims of defendants against him, and as being a man worthy of credit. Defendants say that the plaintiff herein named, some time during the fall of 1896, the exact date of which the defendants cannot state telegraphed to the firm of Barndollar, Bartles & Gibson, asking if their dealings with the said Roy had been satisfactory, and that A. H. Gibson replied that they had, which at that time defendants allege was true; that there had been no disagreement between them and the said Roy, but that everything had been satisfactory. As to the allegations that plaintiff had delivered to Roy the mules and horses, and agreed that their value was $1,215, to be paid February 23, 1897, they have no knowledge or information upon which to answer. That in regard to the extension of credit to Roy by plaintiff upon the ground that plaintiff relied upon the recommendation of Gibson, they have no knowledge upon which to answer. Defendants deny that at the time the alleged delivery of the stock was made to Roy by the plaintiff herein their business relations with the said Roy had not been satisfactory, and further state that they did not make any representation to the plaintiff herein that the said Roy was not indebted to them at the time. They further answer and say that at the time the delivery of the stock is alleged to be made by the plaintiff to Roy, they had no knowledge that the said Roy was insolvent, and that A. H. Gibson was in a position to know, or did know, the fact that the said Roy was insolvent.

.As to the allegations that the proceeds of said stock was paid to defendants by Roy on his indebtedness, pursuant to the agreement made by the said Roy and the defendants, they deny that any such agreement was ever made between them and the said Roy or either of them as to whether or not the said Roy paid them any part of the proceeds of the said stock when they were sold; they have not sufficient knowledge to answer as they were not present when the stock was sold, nor did they have any knowledge of when and where they were sold, or had nothing whatever to do with the stock; deny defendant Moore was ever jointly interested with them, but say he was only an employe at a 'stipulated salary. As to the allegation that Roy absconded without paying the plaintiff, or as to the value of the stock, they have no knowledge upon which to answer. Defendants further deny that by reason of their conduct and of the recommendations of A. H. Gibson for them or either of them, that plaintiff has been damaged in the sum of $1,215, or any other sum, and deny that they ever guaranteed or held out, or made such representation to the plaintiff in regard to the solvency or business ability of the said G. W. Roy as would bind them in any particular whatever, and ask judgment for costs. On January 28, 1902, the trial of the case was commenced before a jury, and on January 31, 1902, the jury returned the following verdict: "We, the jury in the above-entitled case, find for the plaintiff and against J. H. Bartles, J. J. Barndollar, A. H. Gibson, and W. L. Moore, and assess the damages at twelve hundred fifteen dollars ($1,-215.00), with interest thereon at 6 per cent. per annum from Sept. 7th, 1897. Joe Blanchard, Foreman." On February 3, 1902, defendants filed motion for new trial, and on April 17, 1902, the same was overruled by the court, to which defendants excepted, judgment was rendered on the verdict, and defendants appealed to this court.

*Jas. S. Davenport,* for appellants.

*W. H. Kornegay* and *E. S. Bessey,* for appellee.

TOWNSEND, J.  (after stating the facts).  The appellants have filed 36 assignments of error, but, before discussing any of them in detail, it is important, in the first instance, to ascertain what the issues in this case are, as presented by the pleadings, and upon what grounds the plaintiff (appellee) sought recovery against defendants (appellants) in this action. The complaint alleges: That in the latter part of the year 1896, and the earlier part of 1897, defendants were jointly engaged in buying and shipping horses and mules. That during those transactions one G. W. Roy became largely indebted to them, and that defendants learned that he was insolvent.  That with said Roy there was connected one Crabtree.  That after defendants learned that Roy was insolvent and unable to pay them, "said Roy and defendants entered into an agreement, by which Roy was to buy from other parties on credit secured by the recommendation of the defendants sufficient property to pay off and discharge the debt owed to the defendants, and should apply the proceeds to the payment of the debt owed by said Roy to defendants."  That on December 4, 1896, the said Roy, desiring to purchase from plaintiff a car load of horses, "gave to plaintiff the name of the defendants as references to determine his standing and financial responsibility."  That plaintiff went to defendant A. H. Gibson to ascertain the financial responsibility and standing of the said Roy; that Gibson recommended Roy as being prompt, "and as having satisfactorily performed his business agreements with defendants, and as having settled all claims of defendants, against him, and as being a man worthy of credit."  That plaintiff then delivered the stock to Roy, relying upon the recommendation of said Gibson.  Plaintiff further alleged that in fact the transactions between Roy and defendants

had not been satisfactory; that Roy had not promptly met his obligations to defendants; that he was largely indebted to them at the time; all of which Gibson knew. He also knew he was not worthy of credit; that Roy was insolvent at the time, and Gibson knew it; that Roy took the stock away as soon as delivered and the proceeds were applied to the payment of the indebtedness of Roy to the defendants;" and asks judgment for $1,215 as damages against defendants by reason of their recommendation of said Roy.

The defendant Moore filed separate answer, and denies he was ever jointly engaged in buying and shipping horses and mules with the above-named defendants, or that he had any interest in said transactions with the above-named defendants; says he was an employe of his codefendants at a stipulated salary, and had no interest in their business or the profits thereof save as such. Defendants Barndollar, Bartles & Gibson file answer and state they admit that in 1896 they had been buying and shipping horses and mules. They admit they sold horses to G. W. Roy, Crane and Roy, Howell and Roy, and a man named Crabtree who was working with him. They deny that at any time or place they or either of them entered into an agreement by which the said Roy was to buy from other parties stock on credit secured by the recommendation of the defendants herein, and to pay and discharge the debts owed to the defendants by the said Roy; deny that on December 4, 1896, Roy, in pursuance of any agreement made with defendants, applied to plaintiff to purchase any stock; deny that plaintiff, before selling or delivering stock to Roy, went to them or either of them to ascertain the financial responsibility and standing of the said Roy, and deny that the defendant herein, namely, A. H. Gibson, in pursuance of any agreement made with the said Roy, or in any other way, recommended the said Roy as being prompt and having satis-

factorily performed his business agreement with defendants and as having settled all claims of defendants against him and as being a man worthy of credit. Defendants say that in the fall of 1896 plaintiff telegraphed to the firm of Barndollar, Bartles & Gibson, asking if their dealings with the said Roy had been satisfactory and that A. H. Gibson replied that they had, which at that time defendants allege was true; that there had been no disagreement between them and the said Roy, but that everything had been satisfactory. Defendants deny that at the time of the alleged delivery of the stock to Roy by plaintiff that their business relations with the said Roy had not been satisfactory, and further state that they did not make any representation to the plaintiff herein that the said Roy was not indebted to them at the time, and that they had no knowledge that said Roy was insolvent, and that A. H. Gibson was in a position to know or did know the fact that the said Roy was insolvent. They deny that any agreement was ever made between them, or either of them, and Roy, by which the proceeds of the stock was to be paid to them on Roy's indebtedness; deny plaintiff has been damaged $1,215, or any other sum by reason of the recommendation of A. H. Gibson; deny that they ever guaranteed or held out or made such representation to the plaintiff in regard to the solvency or business ability of the said G. W. Roy as would bind them in any particular whatever, and ask judgment for costs. It is clear that if defendants (appellants) are to be held liable in this action it is by reason of the alleged agreement between defendants and Roy, and that in pursuance of said agreement defendant Gibson made a false recommendation as to the credit and responsibility of Roy, knowing the same to be false when made. The defendants not only deny any agreement with Roy as alleged, but deny the alleged recommendation of Roy as alleged. It is said in Lindley on Partnership, vol. 1, p. 163: "An action for damages for misrepresentation cannot, as a general rule,

be maintained, unless the misrepresentation is fraudulent, i. e., false, and known so to be to the person making it, or false, and made recklessly, without any reasonable ground for believing the statement to be true. There is, therefore, a difficulty in holding any person liable to such an action, unless actual fraud by him can be proved. On the other hand, it is difficult, if not impossible, to draw any sensible distinction between the case of fraud and any other wrong, and the weight of authority certainly is in favor of the proposition that actions for damages will lie against a principal for the fraud of his agent committed in the course of his employment, and for his principal's benefit. This doctrine obviously renders a firm liable in an action of damages for the fraud of one of its members, if committed by him in transacting the business of the firm, and for its benefit; but not otherwise."

The complaint alleges that the defendants were jointly engaged in buying and selling horses and mules. It is in evidence that defendants Barndollar, Bartles, and Gibson were in the merchandise business, and also buying and selling horses and mules; that defendant Moore was an employe of said firm on a monthly salary. The question then presents itself, who did Gibson bind by the statement he did make? Was it any part of the business of the firm to answer inquiries as to the credit and responsibility of those with whom they have had dealings, in matters wholly outside of any business transaction of the firm? And if so, and he made a false representation, can he by that act bind his partners unless they knew of the false statement and ratified it? Under the authority above cited, the firm cannot be liable unless the representations were made in the business of the firm. It is not alleged that any representations were made by any one other than Gibson. In Parsons on Partnership, § 126, it is stated: "As a partner may act for his firm by his general authority, so, as we have already

seen, his representations, acknowledgments, admissions, part payments, notice given or received, and all other doings on which rights or obligations may be founded, are binding upon the partnership; always, however, with the qualification that these things belong fairly and actually to the business of the firm; for this is a condition which universally limits his power." And in 1 Bates on Partnership, § 464, it is said: "The great difficulty is to determine whether the tort was committed within the scope of the partner's representative authority. Upon this it may be said generally that all the partners are liable, if they would be liable had the same act been committed by an agent intrusted with the management of its business. Where one partner purchases goods with the fraudulent intention of not paying for them, the other, who was ignorant of the intent, is liable only on contract, and not for the fraud."

What was the representation made by Gibson, as disclosed by the evidence? "Q. Did you at any time receive a telegram purporting to come from Claremore, from this defendant here, A. H. Gibson, or from that firm? A. Yes, sir. Q. (Hands witness paper). Examine this and see if that is the telegram you received? A. Yes, sir." Mr. A. H. Gibson, recalled for plaintiff: Direct examination by Mr. Kornegay: "Q. (Hands witness paper). Please examine what purports to be a copy of a telegram sent by you and see whether or not you sent it? Telegram sent to this plaintiff on December 4th, 1896? A. I think not. The terms and the expressions are different." Mr. J. L. Courtney, recalled for the plaintiff, testified as follows: Direct examination by W. H. Kornegay: "Q. (Hands witness paper). Is this the paper, and the only paper that was ever delivered to you, in this case, by the operator or the messenger of the Western Union Telegraph Company, on December 4th, 1896, December 4th or 5th, 1896, purporting to be a telegram from the defendant, A. H. Gibson? A. Yes, sir; I think that is the one sent me by Mr. Gibson.

There was one come the same day from Roy. Q. Mr. Courtney, I wish you would state if at any time you had a talk with Mr. Gibson here, A. H. Gibson, the defendant, about this telegram, and if so, when was it, and where? A. I saw him on the evening of the 4th. Q. What day of the week was it you saw him? A. On Saturday. Q. Do you know whether that was the 4th or the 5th? A. I guess it was the 5th. Q. What did he say to you about this telegram? A. Mr. Roy took me in and introduced me to him and asked him to explain to me the telegram he had sent, and Mr. Gibson said that he had sent one; and he said— He worded it about the same, and said that Mr. Roy's dealings with them had been satisfactory. Q. Did you have the telegram with you at that time? A. No, sir, I did not. Q. What was the occasion of Mr. Roy's taking you in and introducing you to Mr. Gibson? Mr. Davenport: I object to anything that Roy might have said to this man in the absence of the defendant, Mr. Gibson. Mr. Kornegay. I think it would be part of the res gestae. Court: No, sir, I don't think it would be. Q. (Kornegay) Tell the conversation which took place between you and Mr. Gibson and Mr. Roy. A. We went in there and Roy introduced me to Mr. Gibson, and asked Mr. Gibson to explain to me the telegram that he had wired about his dealings and financial responsibility, and Mr. Gibson said what he had done; then Mr. Roy speaks up and says, 'I have never let a contract fall due on me since I have been here. Mr. Gibson knows I have always settled them up before they came due;' and Mr. Gibson says, 'Yes.' * * * Mr. Kornegay: The message is as follows (reads): 'Received at 2:15 p. m. Dec. 4, 1896. Dated Claremore, I. T. To J. L. Courtney, Afton, I. T. G. W. Roy has had satisfactory dealings with us and other parties this fall. A. H. Gibson.' "

This is the entire evidence, as disclosed by this record, of the representations made by defendant Gibson. It will

be observed that there is no statement as to whether Roy was indebted to the firm of Barndollar, Bartles & Gibson; no statement whether Roy was worthy of credit; no recommendation of his financial responsibility; nothing but the naked statement that his dealings with us and others this fall were satisfactory. When Roy introduced the plaintiff to Gibson the next day, Roy says: "I have never let a contract fall due on me since I have been here. Mr. Gibson knows I have always settled them up before they came due; and Mr. Gibson says, 'Yes.'" It is therefore clearly apparent that the allegations of the complaint as to the representations made by Gibson are not sustained by any proof in the record. As to the agreement alleged to have been entered into between the appellants and Roy, which is the basis of this action, we have examined the evidence contained in the transcript with much care, and do not find any evidence to establish such an agreement as alleged. The counsel for plaintiff, to sustain the issues on his part, introduced testimony of dealings between defendants and Roy, most of which was objected to by defendants, and the court announced that the same would be withdrawn unless its connection was shown with the issues, and a number of the assignments of error by defendants (appellants) are upon that ground. But plaintiff insists that defendants' counsel should have requested the court to withdraw the testimony thus objected to when the connection was not made. This is the rule laid down by Thompson on Trials. Still before a man can be held responsible for the debt of another, if the representations concerning the credit of another were honestly made, its actual falsehood does not render the person making it liable to an action. In Russell vs Clark's Exr's, 7 Cranch (U. S. Sup. Ct.) 90, 91, 3 L. Ed. 271: "The law will subject a man, having no interest in the transaction, to pay the debt of another only when his undertaking manifests a clear intention to bind himself for that debt. Words of doubtful import ought not, it is

conceived, to receive that construction. It is the duty of the individual, who contracts wth one man on the credit of another, not to trust to ambiguous phrases and strained constructions, but to require an explicit and plain declaration of the obligation he is about to assume. In their letter of the 20th, Clark & Nightingale indicate no intention to take any responsibility on themselves, but say that Mr. Russell may be assured Robert Murray & Co. will comply fully with their engagements. In their letter of the 21st, they speak of the letter of the preceding day as a letter of recommendation, and add: 'We have now to request that you will endeavor to render them every assistance in your power.' How far ought this request to have influenced the plaintiff. Ought he to have considered it as a request that he would advance credit or funds for Robert Murray & Co., on the responsibility of Clark & Nightingale, or simply as a strong manifestation of the friendship of Clark & Nightingale for Murray & Co., and of their solicitude that N. Russell should aid their operations as far as his own view of his interests would induce him to embark in the commercial transactions of a house of high character, possessing the particular good wishes of Clark & Nightingale? It is certain that merchants are in the habit of recommending correspondents to each other without meaning to become sureties for the person recommended; and that, generally speaking, such acts are deemed advantageous to the person to whom the party is introduced, as well as to him who obtains the recommendation." And the rule would be the same whether the action was for the value of the property or for damages. The plaintiff in his brief says: "The main reliance of plaintiff to establish the relation between the parties was the contracts between the parties and the entries in their books to show the indebtedness and the inability to pay of the said Roy and defendants' knowledge, but from some unaccountable reason the court ruled out a large part of the evidence, though enough

was allowed to stand of the deposition of W. L. Moore to make out the case, inasmuch as defendants did not object."

The testimony of Moore in regard to those contracts and their extension is as follows: "Q. Had you at any time demanded of Roy the fulfillment of this contract before you got the money out of him? A. I went to Arkansas, went around to the stockyards at Argenta, and saw Roy and Crane. This was some time from the first to the middle of November, and those two men, Roy and Crane, explained to me that owing to the decrease in the price of horses, and the doubling of the value of cattle, and the rise of the White river and the exceeding scarcity of feed since they had intended and did start to trade through the White river bottom, compelling them to sell a horse or two a day for feed for the balance, and the further fact that of the proceeds received they had had to keep their family, and the further fact that Tom Crane's baby had become ill necessitated his return and remaining in town, they were unable to meet this contract promptly. I suggested that we go round to Ben Crabtree's home, he being the one of longest residence in Argenta, and of best recommendation to me and a partner in some of the other contract for cattle sold. While there Roy and Crane repeated their representations, and assured me that if I would give them an extension and such rebate as would permit them to live and fulfill the contract, the then existing conditions of prices of cattle and horses, they would prove to me that my confidence in them was not unfounded. Now I offered to rebate them a $100' on every contract. I gave them a verbal extension of sixty days from the maturity of each contract." And, on page 26, Moore testifies that on December 4, 1896, as follows: "Q. Had he complained at that time with any portion of the contracts according to their terms extending to him credit, and if so, how much? A. He had complied in accordance with

the extension of the contract, but had not complied prior to the maturity of that original written contract, except in the contract of Roy and Holloway wherein $775 was paid before the maturity of the original written contract." It thus appears from Moore's testimony that the contracts had been extended by him prior to December 4, 1896, and under the extensions nothing was due from Roy and his associates on that date to the defendants, Barndollar, Bartles, and Gibson. This would seem to sustain the statement of Gibson that their dealings had been satisfactory.

The complaint alleges that defendants were jointly engaged in the buying and selling of horses and mules, but the evidence is conclusive that defendant Moore was simply an employe of the other defendants, and had no interest whatever in the business. In Lord vs Goddard, 13 How. (U. S.) 198, 14 L. Ed. 111, the court says: "The gist of the action is fraud in the defendants, and damage to the plaintiff. Fraud means an intention to deceive. If there was no such intention, if the party honestly stated his own opinion, believing at the time that he stated the truth, he is not liable in this form of action, although the representation turned out to be entirely untrue. Since the decision in Haycraft vs Creasy, 2 East, 92, made in 1801, the question has been settled to this effect in England. The Supreme Court of New York held likewise in Young vs Covell, 8 Johns. 23, 5 Am. Dec. 316. That court declared it to be well settled that this action could not be sustained, without proving actual fraud in the defendant, or an intention to deceive the plaintiff by false representations. The simple fact of making representations, which turn out not to be true, unconnected with a fraudulent design, is not sufficient. This decision was made 40 years ago, and stands uncontradicted, so far as we know, in the American courts." The appellants complain of the instructions of the court on

the ground that they were not applicable to the facts in the case. There seems to be some foundation for this complaint. While the instructions were correct declarations of the law applicable to matters of contract between the parties, that is not the case on trial, this being an action for damages for misrepresentation in saying that the dealings of defendants with one Roy had been satisfactory. If the defendant Gibson in making that statement, honestly believed it, there could be no recovery, and if he made the statement knowing the same to be false, and with the design and intent to injure the plaintiff, his codefendants, as partners, would not be liable, unless they knew it and ratified it, because the statement made was not in the transaction of the business of the firm. And as to defendant Moore, unless he knew and ratified it, he could not be bound, because he was not jointly interested in the business of the other defendants, and there is no evidence that he himself made any representations whatever

The sixth instruction given by the court is as follows: "You are further instructed that mere silence or a failure to communicate facts within seller's knowledge, is not such a fraud as will avoid a contract, or render the seller·liable. To have that effect there must be some concealment, as by withholding information when asked, or using some trick or device to mislead the purchaser." This instruction seems to apply to dealings between seller and purchaser, and certainly has no application to this case. In Bowen vs Clarke (Or.) 30 Pac. 430, 29 Am. St. Rep. 626, the court says: "We have several times held that abstract propositions of law, however correct in themselves, are necessarily misleading and mischievous. They tend to draw the minds of the jurors away from the real facts in the case to something which they assume to exist, but which cannot be found in the record." In Davis vs Patrick, 122 U. S. 154, 7 Sup. Ct. 1109, 30 L. Ed. 1090, the court says:

"The last instruction quoted was therefore based upon an erroneous theory, unsupported by evidence, and the jury may have rendered its verdict upon this erroneous theory, ignoring the view that the defendant was the company. This second erroneous instruction may therefore have misled the jury to the injury of the defendant."

It is therefore our judgment that this case should be reversed and remanded, and it is so ordered.

Reversed and remanded.

CLAYTON and LAWRENCE, JJ., concur.